**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID O'HARA,              )
                                  )
          Plaintiff,       )
                                  )
        v.                )     Civil Action No. 08-1393
                                  )     Judge Nora Barry Fischer
JOREL HANLEY, as an individual,   )
CRAIG MILLER, as an individual,   )
YVONNE SUPPOK, as an individual,  )
                                  )
          Defendants.   )
                                  )
                                  )

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

Plaintiff David O'Hara ("Plaintiff") pursues this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Yvonne Suppok ("Suppok") seeking redress for claims of unlawful arrest and malicious prosecution in violation of his Fourth Amendment rights under the United States Constitution, and intentional infliction of emotional distress under Pennsylvania law. (Docket No. 16).

Before the Court is the motion for summary judgment filed by Suppok. (Docket No. 83). For the following reasons, the Court GRANTS the Suppok motion and judgment is entered in her favor on all claims.

## II. FACTUAL BACKGROUND

### a. Identification of the Parties

Plaintiff is a 44 year old construction worker who is currently a resident of Carmichaels, Pennsylvania. (Docket No. 67, Ex. A, pp. 6-7). At the time of the events giving rise to this lawsuit, Plaintiff was residing with Rose Della Kennedy and her two children, TL and CL.[1] *Id.* Since the filing of the lawsuit they have married. *Id.* At the time of his arrest, Kennedy's brother and CS lived in Plaintiff's home. (*Id.* at p. 17). CJ is the mother of SB, a female minor, who visited plaintiff's residence from time to time. (*Id.* at pp. 60-61). SB lived with her grandmother, BB, who is SB's legal guardian. SB has been the subject of a custody battle between CJ and BB. (Docket No. 64, ¶¶ 2, 3). Also living with Plaintiff were his niece and nephew. (*Id.* at pp. 55-56).

At the time of the circumstances underlying this lawsuit, Defendant Jorel Hanley ("Hanley"), an employee of the Cumberland Township Police Department, was serving as a patrolman while Defendant Craig Miller ("Miller"), also an employee of the Cumberland Township Police Department, was serving as a sergeant. (Docket No. 67, Ex. H, p 11; Ex. C, pp. 4-5). Suppok was a caseworker for Greene County Children and Youth Services ( "CYS"). (Docket No. 102, pp. 14). Former Defendant Michael Schlesinger ("Schlesinger")[2] was a supervisor for CYS and served as the direct supervisor of Suppok. (Docket No. 102, pp. 51).

### b. Facts Related to Childline Investigation

On September 8, 2006, a call was made by BB to the ChildLine and Abuse Registry Intake Unit reporting alleged child sexual abuse to SB. (Docket Nos. 84, ¶ 1; 86, Ex. 1). The

---

[1] All minors involved in this case are referred to by initials pursuant to Fed.R.Civ.P. 5.2.
[2] Schlesinger has died since the filing of this case and his estate has not been substituted as a party. All claims against him have been dismissed, with prejudice. (Docket No. 109).

report made allegations that SB was sexually abused by Plaintiff. (Docket Nos. 84, ¶ 1; 67, Ex. J, p. 34; Ex. H, p. 23; 86, Ex. 1).

ChildLine is a state sponsored child abuse reporting service available 24 hours a day to receive reports of suspected child abuse. It accepts calls from the public and professional sources. Any person may report suspected abuse, even if the individual wishes to remain anonymous. Each call is answered by a trained intake specialist who will interview the caller to determine the most appropriate course of action. Actions include forwarding a report to a county agency for investigation of child abuse or general protective services; forwarding a report directly to law enforcement officials; or referring the caller to local social services. 23 Pa.C.S.A §§6301 *et. seq.*; Pa. Code §§3490.11 *et. seq.*

The subject ChildLine report was referred to Greene County CYS and assigned to Mark Starstanko, a Greene County CYS caseworker for investigation. (Docket No. 84, ¶ 1; 67, Ex. J, p. 34; Ex. H, p. 23). Starstanko informed Plaintiff of the allegations made against him as well as the identities of the callers and the fact that an investigation would be conducted. (Docket No. 67, Ex. A, pp 22-25; 102, pp. 34-36). Subsequently, Starstanko resigned and the investigation was reassigned to Aimie Hunchuck, another CYS caseworker.  (Docket No. 84, ¶ 5). On September 18, 2006, Hunchuck sent a "Report of Suspected Child Abuse to Law Enforcement Official" (CY-104 form) notice to the Greene County District Attorney's office. (Docket Nos. 84, ¶ 6; 86, Ex. 1). Hunchuck later resigned and the investigation was again reassigned at CYS to Suppok. (Docket No. 84, ¶¶ 7, 8). The CY-104 Form indicates that a copy was sent to the Cumberland Township Police Department. (Docket No. 86, Ex. 1). On or about September 20, 2006 the form was received by the Cumberland Township Police Department and the matter was assigned to Hanley for investigation. (Docket No. 67, Ex. B, pp. 18-26). Because Hanley had not

handled a child sexual abuse complaint before, he consulted Miller as to where the forensic interview of SB would be conducted, directions to the facility and other interviews Hanley should consider in conducting the investigation. (Docket No. 67, Ex. B, pp. 21-22).

A forensic interview of SB was conducted on September 29, 2006 at the Children's Advocacy Center in Pittsburgh. (Docket No. 86, Ex. 12). Present at the interview were Suppok, Hanley, Miller and Jamie Mesar ("Mesar"). Mesar, a forensic specialist, conducted the interview of SB. (*Id.*). Mesar concluded that SB was able to distinguish truth from a lie and was resistant to suggestibility. (*Id.*). During the interview, SB described in great detail the nature of the alleged sexual assault by Plaintiff. (*Id.*). SB further informed Mesar that Plaintiff had abused her twelve times. (*Id.*). On the same date, a medical exam of SB was conducted by Janet Squires, M.D.[3] The medical exam was inconclusive as to the allegations of abuse. (*Id.*).

During the forensic interview, SB disclosed that Plaintiff had also sexually abused CL. (*Id.*). After the interview, a report of this allegation was made to ChildLine by Mesar. (*Id.*). Also, during the forensic interview, SB claimed to have been exposed to pornographic movies by CJ and CJ's boyfriend. (*Id.*). When asked about this claim, BB advised Mesar that BB was aware of this incident and had reported it previously to CYS. (*Id.*). Mesar reported the claim that CJ had exposed SB to pornographic movies to ChildLine. (*Id.*). Ultimately, the claim of exposure to pornographic movies was reported to the Cumberland Township Police Department for investigation and the investigation was likewise assigned to Hanley. (Docket No. 67, Ex. B, pp. 26-28; 61-62). The allegation made by SB that Plaintiff had also sexually abused CL, however, was investigated by Greene County CYS caseworker Mary Jo Ullom ("Ullom"). (Docket No. 86, Ex. 14, pp. 9-12).

### c. Other Claims Involving SB

---

[3] Dr. Squires is the director of the Pittsburgh Child Advocacy Center. (Docket No. 86, Ex. 8).

Between September 8, 2006 and October 13, 2006, Plaintiff learned of three other claims made by SB against CJ, DR and TC. (Docket No. 84, Ex. 9, pp. 36- 40). DR is SB's uncle and TC is SB's younger brother. (*Id.*)

### d. Plaintiff's Interview

On October 13, 2006, Plaintiff was interviewed at Greene County CYS. (Docket No. 86, Ex. 12). Present for the interview were Suppok, Hanley and Miller. (*Id.*) Miller indicated that he would be the officer in charge on the case and would be supervising Hanley. (Docket No. 79, Ex. A, ¶ 7). During this meeting, Plaintiff was questioned regarding the allegations made by SB and BB. (Docket No. 86, Ex. 12). Plaintiff denied them and responded by stating that the allegations were fabricated for the purpose of allowing BB to retain custody of SB. (*Id.*). Moreover, Plaintiff informed Defendants Suppok, Hanley and Miller that SB had made other similar allegations against relatives with whom she had contact. (Docket No. 84, Ex. 9, pp. 36- 40). At the interview, Plaintiff appeared to be in an agitated state and threatened to sue BB to whom he referred as "that bitch." (Docket No. 86, Ex. 12).

Plaintiff claims that he provided the following information to Defendants Suppok, Hanley and Miller during this interview: (1) SB had brought unfounded allegations of sexual abuse on prior occasions against other individuals, none of which were found to be credible; (2) BB had a clear motive to implicate Plaintiff and others in claims of sexual assault in order to further her goal of obtaining full legal custody of SB, evidenced in part by her alleged threat against Plaintiff's wife when she was required to testify against BB in a custody hearing (Docket No. 79, Ex. A, ¶ 7 (C)-(F))[4]; (3) the allegations made by SB were physically impossible because the abuse was alleged to have occurred on the second floor of the dwelling where Plaintiff lived yet Plaintiff was not capable of climbing stairs because of a work related injury to his knee; (4) CL

---

[4] Kennedy makes no mention of this threat in her affidavit. (Docket No. 79, Ex. B).

was prepared to (and later did) deny the claims made against Plaintiff by SB, including the claims of sexual assault on SB and CL; and (5) other facts, which Plaintiff claims cast doubt on the credibility of SB's and BB's claims against Plaintiff. (Docket No. 79, Ex. A, ¶ 7).[5] Plaintiff admitted that in the past he had shaved his genitals in a particular manner. (Docket No. 67, Ex. A, pp. 66-67). Specifically, Plaintiff stated that he shaved the area around his testicles. (*Id.*) He also told Defendants Suppok, Hanley and Miller that BB had threatened Plaintiff and his wife about interfering with the custody of SB. (Docket No. 79, Ex. A, ¶ 7). Plaintiff further informed Defendants Suppok, Hanley and Miller that while SB alleged that Plaintiff locked the door

---

[5] While Plaintiff sets forth a long list of information provided to Defendants Suppok, Hanley and Miller in his affidavit, Plaintiff was substantially less forthcoming at his deposition where he testified that he only told these defendants about claims made previously involving abuse to SB by her younger brother and her uncle. (Docket No. 67, Ex. A, pp. 28-29; 35-4). In Plaintiff's affidavit, he describes seven prior claims against six different people. (Docket No. 79, Ex. A). The Court of Appeals for the Third Circuit has consistently affirmed its position that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) *(citing Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)); *see also Walker v. City of Wilmington*, 360 Fed. Appx. 305, 315 (3d Cir. 2010); *O'Bryant v. City of Reading*, 197 Fed. Appx. 134, 138 (3d Cir. 2006). Accordingly, the court, in line with every other circuit, has enunciated a version of the "sham affidavit doctrine." *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007) (listing each circuit's precedential case concerning the doctrine).

     The Court of Appeals' rationale for this doctrine draws heavily from the Supreme Court and is worth repeating at length:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.. . . . [When] an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

> The main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits. . . . Depositions are adversarial in nature and provide the opportunity for direct and cross-examination. . . . Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible.

*Id.* at 253-54.

     When either "independent evidence in the record [exists] to bolster an otherwise questionable affidavit," or when a party offers a "satisfactory explanation" for the conflict, courts have generally refused to disregard the affidavit. *Id.; Hackman*, 932 F.2d at 241. The Court of Appeals thus created a discretionary guideline for the court, allowing flexibility for instances of contradictory affidavits. *Jiminez*, 503 F.3d at 252. When the statements within an affidavit are not in direct conflict with prior deposition testimony, but rather *supplement* the testimony, a court has no basis for disregarding those statements. *Husick v. Allegheny County*, 2010 U.S. Dist. LEXIS 46022, at *20 (W.D.Pa, May 10, 2010). However, courts recognize that significant variance between the deposition and affidavit would allow the court to grant greater weight to the deposition. *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 2010 U.S. Dist. LEXIS 31619, at *24-25 (M.D.Pa. March 31, 2010). For the purposes of this opinion, it is sufficient to say that Plaintiff has averred and thus, offered evidence that there were prior accusations of sexual abuse made by or on behalf of SB known to Defendants Suppok, Hanley and Miller.

during the abuse, there was no lock on the door for the room where the abuse purportedly occurred. (*Id.*; Docket No. 67, Ex. B, pp. 39-40).

### e. Ullom's Determination

On October 16, 2006, Ullom made the determination that the claim against Plaintiff for sexually assaulting CL was unfounded based on the fact that CL denied that she had been sexually assaulted. (Docket No. 84, Ex. 14, p. 12). While Hanley was aware of the claim of abuse to CL that allegedly occurred at the same time as the abuse of SB, Hanley never interviewed CL because, in his opinion, her denial of the assault was not credible. (Docket No. 67, Ex. B, p. 74). Suppok, by the time of Ullom's determination that the alleged assault of CL was unfounded, had already determined that the claim by SB against Plaintiff was indicated. (Docket No. 102, p. 80). Suppok reviewed the investigation regarding CL and found that the investigation did not follow protocol because there had been no forensic interview. (Docket No. 102, pp. 80-81). Hence, the unfounded determination as to CL did not influence Suppok's view of the claims made against Plaintiff by SB. (Docket No. 102, pp. 80-83). Plaintiff was then informed by Suppok that he was determined to be an indicated sexual perpetrator on November 3, 2006 and that he was the subject of a criminal investigation. (Docket No. 16, ¶ 5). Nevertheless, while the criminal and civil investigations were ongoing after October of 2006, Plaintiff maintains that Suppok apologized to him on two occasions and admitted that she knew that the accusations against Plaintiff were false. (Docket No. 67, Ex. A, p. 131).

### f. Cumberland Township Investigation

During the Cumberland Township Police investigation of Plaintiff, Hanley interviewed or questioned Plaintiff, BB, CJ, Plaintiff's ex-wife, and Plaintiff's current wife. (Docket No. 67, Ex. B, pp. 34-35, 46, 56-57, 59, 66). During the November 1, 2006 interview of Plaintiff's current

wife, Rose Della Kennedy, Hanley took notes and prepared a typewritten summary of the information he secured. (Docket No. 67, Ex. B, p. 63). Hanley recorded his understanding that Plaintiff was still shaving his genital area surrounding his testicles around the time of the alleged assault on SB. (*Id.*). Hanley was aware that SB had described Plaintiff's genitals as being "hairy on top" and concluded that Plaintiff's shaving practice was similar to SB's description. (*Id.*) Both Plaintiff and his wife aver that they told Hanley that Plaintiff's practice of shaving his genitals had ceased three years before the alleged abuse. (Docket No. 67, Ex. A, pp. 66-67; 79, Ex. B, ¶ 8). Yet, Plaintiff's ex-wife told Hanley she believed it was possible, in her opinion, that Plaintiff would sexually abuse a child. (Docket No. 67, Ex. B, p. 66).

On November 6, 2006, Plaintiff was informed by CYS that the second set of allegations of sexual abuse made against him relating to the other minor child were unfounded. (Docket No. 16, ¶ 16). Two weeks later, CJ was informed by Greene County CYS that the allegations of permitting SB to watch pornographic movies were also determined to be unfounded. (Docket No. 16, ¶ 17).[6] Hanley interviewed CJ and was told that SB's observation of the sexual encounter between her and her boyfriend as well as her observation of the objectionable movie were inadvertent. (Docket No. [67, Ex. B, pp. 27-28]). Hanley, however, did not interview CJ's boyfriend because, before he could do so, Hanley determined that SB was not credible with regard to that claim. (Docket No. 67, Ex. B, p. 60).

### g. Meeting with Assistant District Attorney Chambers

On December 7, 2006, Hanley met with Assistant District Attorney Linda Chambers ("ADA Chambers") to review the information gathered in the police investigation of SB's accusation of sexual assault by Plaintiff and to consult with ADA Chambers to determine if criminal charges should be filed. (Docket No. 67, Ex. D, ¶ 2). ADA Chambers advised Hanley

---

[6] Suppok was aware of these facts. (Docket No. 102, pp. 50-52).

that probable cause existed and recommended that Plaintiff be charged with indecent assault; sexual assault; statutory sexual assault; aggravated indecent assault; rape of a minor under 13 years; and corruption of minors. (Docket No. 67, Ex. D, ¶ 3). Once the charges were filed, ADA Chambers took over the prosecution of Plaintiff. (Docket No. 67, Ex. D, ¶ 4). At the time of Hanley's consultation with her, ADA Chambers was unaware that SB had made allegations of sexual abuse against others in the past and that all of the accusations except those against Plaintiff had been determined to be unfounded. (Docket No. 67, Ex. D, ¶ 5). It appears that ADA Chambers was equally unaware that the claim against Plaintiff with regard to the sexual assault by CL was denied by CL and determined by CYS to be unfounded. (*Id*.). Nevertheless, ADA Chambers claims she would have recommended the filing of charges even if she had known of the past unfounded allegations. (Docket No. 67, Ex. D, ¶ 4). ADA Chambers did interview SB in preparation for the prosecution and found SB to be credible, but the Court notes this interview appears to have occurred after the charges were filed. (Docket No. 67, Ex. D, ¶ 5).

### h. Removal of Niece and Nephew from Home

On December 28, 2006, CYS caseworker Sally Mox came to Plaintiff's home and removed Plaintiff's niece and nephew from his custody. (Docket No. 67, Ex. A, pp. 55-58). The children were removed in order to carry out the terms of a safety plan for children in the home. (*Id*.). While the niece and nephew were removed from Plaintiff's home, TL and CL were permitted to remain, although Plaintiff was not permitted to be alone with them. (*Id*.).

### i. Plaintiff's Arrest

Hanley filed a Police criminal complaint against Plaintiff before District Magistrate Judge Lee Watson on January 3, 2007 that included a list of the acts committed by the Plaintiff, the charges and an affidavit of probable cause. (Docket No. 67, Ex. I). A warrant was issued for

Plaintiff's arrest and Hanley proceeded to Plaintiff's house to serve the arrest warrant. (Docket No. 64, ¶¶ 25-27). Plaintiff was not there at the time but Plaintiff voluntarily turned himself in to the Cumberland Township Police Department and was arrested by Hanley on January 4, 2007. (Docket No. 67, Ex. A, p. 71). After turning himself in, Plaintiff was handcuffed and placed in a police car. Plaintiff was then transported to the office of Magisterial District Judge Louis M. Dayich for arraignment. (Docket No. 67, Ex. A, p. 72). Plaintiff avers that Hanley apologized for his arrest and admitted that the entire matter was only the result of a custody dispute and that Hanley was just doing what he was told. (Docket No. 79, Ex. A, ¶ 6). Hanley nevertheless presented the charges before District Judge Dayich who set bail at $25,000 and restrictions for Plaintiff's release. (Docket No. 67, Ex. E). As a result of his arrest, Plaintiff was incarcerated, posted a $25,000 bond and was given travel restrictions during the pendency of the criminal proceedings. (*Id*.). While not in the written bail restrictions, Plaintiff and others recall Plaintiff being told by District Judge Dayich that he was not to leave the Commonwealth of Pennsylvania. (Docket No. 67, Ex. A, p. 74; 79, Ex. B, ¶ 11; Ex. D, ¶ 2).

### j. Criminal Complaint

On January 7, 2007, Hanley filed a criminal complaint before District Justice Lee Watson accusing Plaintiff of rape of a child; indecent sexual assault; sexual assault; statutory sexual assault; indecent assault; indecent exposure; and corruption of minors. (Docket No 67, Ex. I). In support of these accusations, Hanley filed an affidavit of probable cause dated January 3, 2007 that averred as follows:

> On September 14, 2006 your affiant was given a sexual assault incident from Children Youth Services. This report stated that victim [SB] 7 years old was sexually assaulted by David O'Hara in the upstairs bedroom of the defendant's house between the dates of October 2005 and April 2006. The defendant would come into the children's room at night and tickle her private parts until it hurt. Child disclosed that defendant would also make child touch defendant's private

parts. This would happen when victim would stay for overnight visits with her mother [CJ].

On September 29, 2006, your affiant, Sgt. Miller, Yvonne Suppok (CYS) arrived at Children's Hospital in Pittsburgh for a forensic interview with the victim. Your affiant and others mentioned observed the interview through a two way mirror while Jamie Messar interviewed the victim. Prior to interviewing victim [BB] paternal grandmother, was interviewed. Ms. Brown stated that she was stuffing a turkey in her kitchen and removed the neck. While doing so Victim stated that [CL] locks her door to keep Dave out. When [BB] asked why victim stated because he comes in and tickles our private parts. [BB] asked why she did not say this before and victim stated "because it felt good".

While at the Childs Advocacy Center Victim was asked by Ms. Messar why she was here. Victim stated "because of Dave". When asked what about Dave victim stated "he did what grown-ups do". Victim defined what grown-ups do and she stated "sex". Victim described sex as "takes your clothes off and get on top of someone". Victim stated that on one occasion, her and [CL] were playing with dolls in their room and [CJ] stated to them it was time to go to bed. Victim stated that defendant left the room and the girls were dressed and sleeping on their backs. Victim stated that the defendant came back into the room wearing panties. Victim describes the panties as "bathing suit". Victim stated that the defendant then got on the bed on top of our legs. Victim then stated the defendant then "put his private where her private was". Victim then reported that his private was outside her private and was moving back and fourth [sic]. Victim then reported that defendant tried to put his private in her private but couldn't. When asked why not, victim stated "because his was too big and mine was too little". Victim described defendants private area as "hairy not from the bottom but on top". Victim stated that on a different occasion the defendant would do the same thing. "he put his hand down our pants again and rubbed his pee bug on ours. "Victim stated that on this occasion defendant came in the room wearing his panties. The defendant took his panties off and then got on the bed between [CJ] and the victim on his knees. The defendant would then make her rub his pee bug. Victim stated that he would grab her hand and make her rub it back and fourth [sic] using her whole hand. Victim stated that nothing ever came out of his pee bug. On this same occasion the defendant would lay on his back and make the victim get on top of his legs and he would rub himself. Victim then stated "put our private on his private." Victim stated that she would then have to move back and fourth [sic]. When asked what it felt like the victim stated "felt like he was doing it to us". Victim described the defendants private as being "hard".

(*Id*.). Absent from the affidavit are the facts known to Hanley at the time of the preparation of the affidavit of probable cause that contradicted the affidavit's assertions. First, the allegation that CL locked her door to keep Plaintiff out is contradicted by the fact the door had no locking

mechanism. Second, the allegation that CL was also a victim was contradicted by the fact CL denied any sexual abuse by Plaintiff at any time, and specifically denied the claims made by SB against Plaintiff. Also, omitted from the affidavit of probable cause was any mention of the custody dispute between BB and CJ and the allegations of sexual abuse made by SB against others previously to and simultaneously with the allegations against Plaintiff, all of which were determined to be unfounded and for which no police investigation was pursued.

### k. Pre Trial Proceedings

A Preliminary Hearing took place before Magisterial District Judge Lee Watson. (Docket No. 67, Ex. B, pp. 50-54). SB testified at the Preliminary Hearing that Plaintiff had assaulted her on only two occasions rather than the twelve alleged at the forensic interview. (*Id.*) Plaintiff asserts that he was ordered by District Judge Watson to appear to have his fingerprints taken at the Cumberland Township Police Department. (Docket No. 79, Ex. A, ¶ 2). When Plaintiff appeared to be fingerprinted, Hanley told Plaintiff that BB had submitted a pair of underwear belonging to SB that BB had kept in the freezer since the alleged event. (Docket No. 79, Ex. A, ¶¶ 3, 4). Hanley told Plaintiff that the underwear had been examined and found to never have been worn. (*Id.*). Plaintiff claims Hanley apologized to Plaintiff "for all this" at that time. (*Id.*). [7]

An Omnibus Motion seeking suppression of evidence was filed by Plaintiff and a hearing took place on August 14, 2007 before Judge William Nalitz of the Court of Common Pleas of Greene County. (Docket No. 67, Ex. G). The principal argument asserted by Plaintiff as Defendant in the criminal proceedings was that SB's testimony was tainted and, therefore, unreliable. (Docket No. 67, Ex. H). Plaintiff presented several witnesses and argued that SB's numerous unfounded allegations of sexual abuse as well as the custody dispute between CJ and

---

[7] Plaintiff offers this evidence in his affidavit. (Docket No. 79, Ex. A, ¶¶ 3-5). In his deposition, this event is not mentioned in response to questions regarding contact between Hanley and Plaintiff. (Docket No. 67, Ex. A, P. 97).

BB tainted SB's testimony rendering it inadmissible. (Docket No. 67, Ex. G). Judge Nalitz construed Plaintiff's argument to be that SB was not competent to testify. (Docket No. 67, Ex. H). Judge Nalitz rejected Plaintiff's position and found that SB was competent. Moreover, Judge Nalitz compared the allegations made by SB against the others and found that the allegations against Plaintiff were fundamentally different. (*Id.*). Accordingly, the criminal case proceeded against Plaintiff.

### l. Trial

On January 22, 2008, a jury trial was held in the Greene County Court of Common Pleas on the criminal charges contained in an 18-count criminal information against Plaintiff. (Docket No. 16, ¶ 25). After the jury selection but before the trial started, Plaintiff avers that Hanley again apologized to him and said that he knew that the criminal charges against Plaintiff were false and baseless. (Docket No. 67, Ex. A, pp. 99-101). Nevertheless, Hanley testified for the prosecution during the criminal trial. (*Id.*). At the conclusion of the trial, Judge Grimes directed a verdict in favor of Plaintiff on fourteen of the eighteen criminal counts and the jury subsequently acquitted the Plaintiff on the remaining four counts, deliberating for only a short time. (Docket No. 16, ¶ 25). Consequently, at Plaintiff's request, in May of 2008, the Department of Public Welfare expunged Plaintiff's record. (Docket No. 16, ¶¶ 22, 28).

Miller's only involvement in the criminal prosecution was to accompany Defendants Hanley and Suppok to the initial forensic interview and to participate in the interview of Plaintiff on October 13, 2006. (Docket No. 67, Ex. C, pp. 24-25, 54). Miller did not testify at any stage of the criminal proceedings. (Docket No. 67, Ex. C, pp. 30-31). Neither Suppok nor Schlesinger testified at any hearing or at trial in the criminal proceedings with the exception of Schlesinger's

testimony at the suppression hearing, the substance of which included only the procedures used by the Greene Country CYS office. (Docket No. 92, ¶¶ 37, 38).

### III. PROCEDURAL HISTORY

On October 3, 2008, Plaintiff filed his Complaint against Defendants Hanley, Miller, Cumberland Township, Suppok, Marjorie Fox, Linda Chambers, Schlesinger, and Greene County. (Docket No. 1). Defendants Hanley, Miller, and Cumberland Township moved to dismiss Plaintiff's Complaint on December 26, 2008. (Docket Nos. 5 and 6). Defendants Greene County, Suppok, Marjorie Fox, Linda Chambers, and Schlesinger similarly moved to dismiss the Complaint on January 12, 2009. (Docket Nos. 8 and 9). Plaintiff filed his Responses in opposition on March 9, 2009 and simultaneously filed his Amended Complaint. (Docket Nos. 14, 15, and 16, respectively). Accordingly, the Court terminated Defendants' Motions to Dismiss as moot on March 10, 2009. (Text Entry Order Mar. 10, 2009).

In his Amended Complaint, Plaintiff withdrew his procedural due process and substantive due process claims under the Fourteenth Amendment, claims against Cumberland Township, claims against the police officers in their official capacities, invasion of privacy claims, all claims against Greene County, and all claims against Defendants Fox and Chambers, the prosecutors in his underlying state court criminal case. (Docket No. 16). In his Amended Complaint, Plaintiff alleged three separate section 1983 violations against Suppok: (1) violations of the Fourth Amendment's protections against unlawful search and seizure; (2) malicious prosecution in violation of the Fourth Amendment; and (3) violations of his equal protection rights. (Docket No. 16 at Counts I, II, III). Plaintiff also made claims for money damages for Suppok's alleged violations of the Pennsylvania Constitution; abuse of process and malicious use of civil proceedings; and intentional infliction of emotional distress. Defendants Hanley and

Miller filed their Answer and Affirmative Defenses to Plaintiff's Amended Complaint on March 23, 2009. (Docket No. 17). That same day, Defendants Suppok and Schlesinger filed their Motion to Dismiss Plaintiff's Amended Complaint and Brief in Support. (Docket Nos. 18 and 19). Plaintiff filed his Brief in Opposition on May 18, 2009. (Docket No. 28).

The Court filed its Memorandum Opinion and order on July 8, 2009 addressing said Motion to Dismiss. (Docket Nos. 36 and 37).[8] Plaintiff's claim under the Pennsylvania Constitution as contained in Count III of the Amended Complaint and his claims for abuse of process and wrongful use of civil process contained in Counts IV and V, respectively, were dismissed. (*Id*.). Accordingly, Plaintiff's remaining claims seek redress under 42 U.S.C. § 1983 for alleged deprivation of liberty without due process based on claims of unlawful arrest and malicious prosecution in violation of his Fourth Amendment rights under the United States Constitution, and intentional infliction of emotional distress under Pennsylvania law. (Docket Nos. 16, 36 and 37).

Presently before the Court is the Motion for Summary Judgment filed by Suppok. (Docket No. 83). Supporting Briefs and Concise Statements of Facts were filed by the parties. (Docket Nos. 84, 85, 91, 92). Responses and replies were also filed. (Docket Nos. 93 and 96). The Court heard oral argument on September 30, 2010 after which it permitted additional briefing. (Docket Nos. 101, 104, 107). Having considered the motions, supporting briefs, the factual record before this court and the parties' arguments, for the following reasons, the Court GRANTS the Suppok motion and judgment is entered in her favor on all remaining claims.

## IV. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[8] *O'Hara v. Hanley*, 2009 WL 2043490 (W.D.Pa. July 08, 2009).

FED.R.CIV.P. 56(a) (2010)[9]. Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

## V. ANALYSIS

---

[9] Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute", the "standard for granting summary judgment has not changed." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motions. FED.R.CIV.P. 56

As previously noted, Plaintiff seeks redress under 42 U.S.C. §1983 for claims of unlawful arrest and malicious prosecution in violation of his Fourth Amendment rights under the United States Constitution, and intentional infliction of emotional distress under Pennsylvania law. Plaintiff's principal arguments are that his arrest and prosecution were precipitated and continued without probable cause as a result of an insufficient and/or deliberately misrepresented investigation by Suppok in violation of his Constitutional rights under the Fourth Amendment and are thus actionable under §1983. Plaintiff also claims that the actions of the defendants were outrageous and as such entitle him to damages under the state law tort of intentional infliction of emotional distress.

Suppok argues that because there was probable cause to believe the allegations that Plaintiff had sexually assaulted SB, he was lawfully arrested and prosecuted; that Plaintiff was investigated and determined to be an indicated sexual abuser does not support a §1983 cause of action against her; and that she is entitled to qualified immunity as a complete defense to Plaintiff's claims. Suppok also argues that because Plaintiff has presented no evidence of physical harm, he is not entitled to damages under the state law intentional infliction of emotional distress theory of liability.

The Court first addresses Plaintiff's claim for intentional infliction of emotional distress and then will address the remaining claims against Suppok.

**1. Intentional Infliction of Emotional Distress Claim**

Plaintiff claims that he is entitled to damages for the cause of action of intentional infliction of emotional distress. Defendants assert that Plaintiff has failed to present any evidence of physical harm resulting from the emotional impact of the purportedly outrageous conduct of the defendants and that they are entitled to summary judgment on this claim. The Court agrees.

The Third Circuit recently dealt with such a claim in *Reedy v. Evanson*, 615 F.3d 197, 231-32 (3d. Cir. 2010) and stated as follows:

> While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, *see Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (2000), the Pennsylvania Superior Court has recognized the cause of action and has held that, "in order for a plaintiff to prevail on such a claim, he or she must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa.Super.Ct.2005) (discussing how the Pennsylvania Supreme Court has indicated that, were it to recognize a cause of action for intentional infliction of emotional distress, these would be the requirements necessary for a plaintiff to prevail on such a claim). In addition, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." *Id.*

*Id.* In this case, Plaintiff has offered no evidence of any type of physical harm resulting from the defendants' purportedly outrageous conduct. For this reason, Plaintiff's claim for intentional infliction of emotional distress fails. Summary judgment is entered in favor of Suppok[10] and against Plaintiff with respect to this claim.

## 2.  42 U.S.C. § 1983 Claims

Section 1983 provides a remedy for any person who, under color of law, is deprived of constitutional rights. 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must show that the conduct complained of was committed by a person acting under color of state law; and that said conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Revell v. Port Authority of New York, New Jersey,* 598 F.3d 128, 134 (3d Cir. 2010); *see also Harvey v. Plains Township Police Department*, 421 F.3d 185, 189 (3d Cir. 2005). Here there is no contest that Suppok acted under color of state law.  Hence, the Court must look to the causes of action being asserted and the facts of record to determine whether Suppok's actions deprived Plaintiff of constitutionally protected rights and privileges.

---

[10] This reasoning also applies to Defendants Hanley and Miller whose motions will be the subject of a separate opinion.

In this case, Plaintiff has brought claims of malicious prosecution and false arrest against Suppok. To state a claim for Fourth Amendment malicious prosecution in a §1983 action, Plaintiff must prove that "(1) the *defendant* initiated a criminal proceeding; (2) the proceeding ended in plaintiff's favor; (3) the *defendant* initiated the proceeding without probable cause; (4) the *defendant* acted maliciously or for a purpose other than bringing plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of the proceeding." (emphasis added) *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005). To prevail on his false arrest claim, Plaintiff must demonstrate at trial that the arresting officer lacked probable cause to arrest him. "The proper inquiry in a section 1983 claim based on false arrest ... is not whether the person arrested in fact committed the offense but whether the *arresting officers* had probable cause to believe the person arrested had committed the offense." (emphasis added) *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir.1988); *see Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995). Each element of these causes of action must be supported by evidence. Plaintiff's claims of false arrest and malicious prosecution against Suppok, however, are not supported by the evidence before this Court and thus they fail. Specifically, there is no evidence that any action on the part of Suppok led to Plaintiff's arrest and subsequent prosecution.

Neither CYS, nor its employees, have the power to arrest or the power to criminally prosecute. 23 Pa.C.S. § 6302(b); *see also In Re Interest of J.R.W.*, 631 A.2d 1019 (Pa. Super. 1993). The Pennsylvania Child Protective Services Law is based on the premise that "abused children are in urgent need of an effective child protective service to prevent them from suffering further injury and impairment." 23 Pa.C.S. § 6302(a) (1990). The purpose of the statute is to encourage complete reporting of suspected child abuse, to allow investigation and involvement

of law enforcement in responding to child abuse, to protect children from further abuse, and to provide rehabilitative services to children and parents involved in said abuse. 23 Pa.C.S. § 6302(b). This is what CYS did from the outset of its investigation and what Suppok continued to do once the investigation was reassigned to her. Accordingly, Suppok cannot be liable for false arrest or malicious prosecution unless there is evidence that she somehow instigated the arrest.

As this Court stated in its Memorandum Opinion on Suppok's motion to dismiss,

> While there is no precedent in the United States Court of Appeals for the Third Circuit on this issue, district courts in other jurisdictions have found that false arrest/false imprisonment claims can be brought against an individual other than the arresting officer when that person "instigates" the arrest. *See Lopez v. City of New York*, 901 F.Supp. 684 (S.D.N.Y. 1995)(false arrest claim proper against the chairperson of a community board who the plaintiff claimed directed the arresting officer to make the arrest.); *Fowler v. Robinson*, Civ. A. No. 94-936, 1996 WL 67994 (N.D.N.Y. Feb. 15, 1996)(a false arrest claim was proper against two social workers who gave statements to the police in a child abuse case when one of the workers insisted that the officer arrest the plaintiff in the case); *Shattuck v. Town of Stratford*, 233 F.Supp.2d 301, 313-314 (D.Conn. 2002)(section 1983 false arrest claim proper against a tax collector when that individual instigated the plaintiff's arrest).

*O'Hara*, 2009 WL 2043409, at p. 5. Here, Plaintiff's claim against Suppok is that once assigned the investigation of the sexual abuse accusation against Plaintiff, she did such a poor job that she came to the wrong conclusion which resulted in the prosecution of Plaintiff. Plaintiff's argument assumes Suppok's investigation and finding were the instigating or initiating factors in Plaintiff's arrest. But, to be found to have instigated an arrest, Suppok must have taken specific action to cause the arresting officer to make the arrest. The *Fowler* decision is instructive on this point. In *Fowler*, the court set forth the type of "instigation" that is required to assert a false arrest claim against a party who does not have the power to arrest.

> [T]he Court now considers the role defendants [Child Protective Services caseworkers] played in the arrest. Despite defendants' attempt to down-play the extent to which [the investigating officer] based his decision to arrest [plaintiff] on statements by defendants [Child Protective Services caseworkers], plaintiffs

have again raised a genuine issue of material fact. At his deposition, [the investigating officer] testified that defendant [caseworker] "wanted [plaintiff] arrested" and was "rather insistent that [plaintiff] be charged." He added that in light of the paucity of evidence presented to him, if [defendant caseworker] had not been so adamant, he would not have accepted her and [the other caseworker's] supporting depositions, and that without them, "there was no way I could arrest [plaintiff]." This evidence unquestionably raises a genuine issue of material fact as to whether defendants [Child Protective Services caseworkers] instigated [plaintiff's] arrest, as opposed to merely providing [the investigating officer] with information upon which he relied in making an independent determination, thereby exposing themselves to liability for false arrest.

*Fowler*, at *6. There is simply no such evidence in this regard as to Suppok.

Once the ChildLine report was received by CYS, the District Attorney was notified by CYS caseworker, Hunchuck by way of a CY-104 form. (Docket Nos. 84, ¶ 6; 86, Ex. 1). The Cumberland Township Police Department received a copy of the same CY-104 form. (Docket Nos. 64, ¶ 9; 86, Ex. 1). Hence, there is no evidence that a CY-104 form was sent to anyone by Suppok. Also, there is no evidence that Suppok participated in the decision to arrest and prosecute Plaintiff. Specifically, there is no evidence that Suppok was consulted by Hanley with regard to the decision to file criminal charges. Instead, he consulted ADA Chambers. He then filed an Affidavit and Complaint which Chambers, in turn, prosecuted.

Simply put, Suppok did nothing to cause the filing of the criminal charges or the prosecution of Plaintiff. While the factual record does establish that the CYS and Cumberland Township Police Department investigations were concurrent, and with regard to the forensic interviews of Plaintiff and SB, simultaneous, the investigations were independent and the consequences of each were different. CYS made a civil determination that Plaintiff was an indicated sexual abuser, while the police investigation resulted in the arrest of Plaintiff and the filing of criminal charges. Given there is no evidence to support the claim that Suppok instigated

or pressured Hanley to arrest Plaintiff and file criminal charges, these claims against Suppok are dismissed, with prejudice.

Plaintiff's only other asserted violation of a constitutionally protected right or interest against Suppok relates to his niece and nephew who were living in his home. On December 28, 2006, CYS caseworker Sally Mox[11] ("Mox") came to Plaintiff's home and removed Plaintiff's niece and nephew from his custody. Suppok accompanied her because Mox wanted to have two CYS caseworkers present to remove the two children from Plaintiff's home. (Docket Nos. 67, Ex. A, pp. 55-58; 102, pp. 93-97). Suppok's only involvement in this event was as an assistant to Mox, who had made the determination that the two children were to be removed from the home without any input from Suppok. (Docket No. 102, pp. 93-97). Once again, the difficulty with Plaintiff's argument is that it assumes Suppok made the decision to remove his niece and nephew from his home. There is simply no evidence to that effect.

Moreover, an interest in custody of a niece and nephew has not been recognized as constitutionally protected. *Breakwell v. Allegheny County Dept. of Human Services*, 2010 WL 4146196, *3 (3d Cir. October 22, 2010). Hence, the limitation on Plaintiff's contact with these children by CYS in this Court's estimation was not a violation of any constitutionally protected right held by Plaintiff. Moreover, there is no evidence that Plaintiff requested any type of hearing where he could contest the actions taken by CYS and regain possession of his niece and nephew. Accordingly, Plaintiff cannot succeed on any claim against Suppok based on the removal of his niece and nephew from his home.

Given the above cited authority and these facts, the Court finds Plaintiff has not established a constitutionally protected right that has been violated by Suppok. Accordingly, the Court need not address the question of Suppok's qualified immunity.

---

[11]     The Court notes that Mox was not sued in this case.  (*See* Docket Nos. 1, 16).

## VI.     Conclusion

Based on the foregoing, Suppok's Motion for Summary Judgment (Docket No. 83) is

GRANTED. Judgment is entered in favor of Suppok and Plaintiff's claims against Suppok are

dismissed, with prejudice.  An appropriate Order follows.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Date:   March 14, 2011

cc/ecf:   All counsel of record.